**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-01377-NYW

CONNIE HINES,[1]

        Plaintiff,

v.

CAROLYN W. COLVIN,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Magistrate Judge Nina Y. Wang

      This action comes before the court pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Commissioner of Social Security's ("the Commissioner") final decision denying the application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") filed by Plaintiff Connie Hines ("Plaintiff" or "Ms. Hines"). Pursuant to the Order of Reference dated August 25, 2015, this civil action was referred to the Magistrate Judge for all purposes pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c). [#25]. The court has carefully considered the Complaint filed on May 16, 2014 [#1], Defendant's Answer filed on November 6, 2014 [#9], Plaintiff's Opening Brief filed on

---

[1] In the caption of her Opening Brief, Plaintiff refers to herself as "Consepcion," instead of "Connie," which she uses in her Summons and Complaint. *Compare* [#16] *with* [#1]. The court notes that the Social Security Administrative Record (the "Record"), which was filed on the Electronic Court Filing ("ECF") system as [#10], also refers to Plaintiff as "Consepcion" and "Connie," interchangeably.

February 4, 2015 [#16], Defendant's Response Brief filed on April 2, 2015 [#19], the entire case file, the administrative record,[2] and applicable case law. For the following reasons, the decision is REVERSED, and the case is REMANDED to the Commissioner.

## STANDARD OF REVIEW

To provide context for the background of the case, the court will first address the standard of review. A five-step evaluation process governs whether a claimant is disabled under the Act. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750. In order, the Administrative Law Judge's ("ALJ") analysis proceeds as follows:

1. The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity. A claimant who is working is not disabled regardless of the medical findings.

2. The ALJ must then determine whether the claimed impairment (which can be a combination of medical conditions) is "severe." A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.

3. The ALJ must then determine if the impairment meets or equals in severity certain impairments described in Appendix 1 of the regulations. If the ALJ determines that the impairment meets or equals in severity, then the analysis concludes and the claimant is determined to be disabled.

---

[2] *See* [#10-1 through #10-14] (the "Record"). For consistency and ease of reference, this Order utilizes the docket number and page number assigned by the ECF system for its citations to the court file, including the Record.

4. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant can perform his past work despite any limitations. In order to perform the analysis under step 4, the ALJ must first determine a claimant's residual function capacity, defined as her ability to do physical or mental work on a sustained basis, despite her impairments. The assessment of residual function capacity must take into account all impairments, even if a particular impairment is not considered severe.

5. If the claimant does not have the residual functional capacity to perform her past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work in the economy. This determination is made on the basis of the claimant's age, education, work experience, and residual function capacity.

20 C.F.R. § 404.1520(b)-(f). "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's "residual functional capacity, age, education, and work experience." *Neilson*, 992 F.2d at 1120.

In reviewing the Commissioner's final decision, the court is limited to determining whether the ALJ applied the appropriate legal standards and supported his or her findings with substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Angel v. Barnhart,* 329 F.3d 1208, 1209 (10th Cir. 2003). The court may not reverse an ALJ simply because she may have reached a different result, as the issue on appeal is whether the ALJ's findings were supported by substantial evidence in the record. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a

mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation and quotation omitted). Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation and quotation omitted). Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## PROCEDURAL HISTORY AND BACKGROUND

### I.   Procedural History

Ms. Hines filed this instant Title XVI application on January 31, 2011, alleging a disability onset date of June 15, 2009. [#10-5 at 2]. On May 31, 2011, Ms. Hines' application was denied. [#10-3 at 2-16]. Plaintiff subsequently requested a hearing before an ALJ, which was held on August 28, 2012. [#10-4 at 9-11; #10-2 at 34-67]. On September 12, 2012, the ALJ issued a partially favorable decision, finding that Ms. Hines was not disabled prior to April 8, 2012, but became disabled as of that date and continues to be disabled to the present. [10-2 at 14-29]. The ALJ also found that Ms. Hines had previously filed a claim for SSI benefits, that was denied at the initial level on December 2, 2009 and that was not appealed. [*Id.* at 18-19]. Due to the *res judicata* effect, Ms. Hines is not permitted to seek any benefits prior to December 3, 2009. [*Id.*].

Ms. Hines appealed. The Appeals Council then denied the Ms. Hines' request for review. [*Id.* at 2-4]. The ALJ's decision is final for purposes of this court's review. 20 C.F.R. § 404.981. The core issues raised by Ms. Hines' appeal are (1) whether the ALJ erred in not considering her carpal tunnel syndrome as a severe impairment; and (2) whether the ALJ erred in determining the onset date for her disability.

## II.     The ALJ's Decision and Plaintiff's Contentions of Error

As noted above, the Social Security Administration utilizes a five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. § 416.920(a). The steps are followed in order, and if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. *Id.*

### A.     Plaintiff's Carpal Tunnel Syndrome

At Step 2, the ALJ found that despite clinical indications dating back to the spring of 2010 that Ms. Hines suffered from carpal tunnel syndrome in her right wrist and hand, this "impairment[]" did not "impose more than minimal vocationally relevant limitations" and was "non-severe." [#10-2 at 21-22]. In making this finding, the ALJ interpreted the evidence in the record to suggest that the initial course of recommended treatment was mild, and that Ms. Hines had not consistently complained of or sought to treat the condition subsequent to diagnosis. [*Id.*]. In determining Plaintiff's residual functional capacity at Step 4, Ms. Hines' carpal tunnel syndrome was not expressly addressed by the ALJ. [*Id.* at 24-26].

Plaintiff contends that the ALJ's determination that Ms. Hines' carpal tunnel syndrome was non-severe was not supported by substantial evidence. [#16 at 21-23]. Plaintiff also contends that even if this finding were supported by substantial evidence, the ALJ erred in failing

to account for the impairment in determining Ms. Hines' residual functional capacity at Step 4. [*Id.* at 23].

### B.   Date of Disability Onset

Ms. Hines alleged a disability onset date of June 15, 2009, which was subsequently revised to December 3, 2009 given the ALJ's determination that she was precluded by her earlier application from claiming an earlier date. [#16 at 7, 17, and 26; #10-2 at 18-19]. At Step 2, the ALJ found that as of June 15, 2009, Plaintiff's bipolar disorder, anxiety disorder, and attention deficit disorder were severe impairments. [#10-2 at 21-22]. However, at Step 4, the ALJ also found that Ms. Hines' mental health impairments were not so collectively limiting as to preclude substantial gainful employment until April 8, 2012. [*Id.* at 22-26]. In making this finding that April 8, 2012, rather than June 15, 2009, was the date of onset for her disability, the ALJ relied on evidence that from 2010 to 2011, Ms. Hines' mental health impairments had been responsive to treatment, and that clinical evaluation of Ms. Hines' social and daily functioning indicated that Ms. Hines would be capable of working in certain positions requiring only a limited amount of social interaction. [*Id.* at 24-26]. The ALJ concluded that Plaintiff only became disabled after she was admitted to a psychiatric care facility on April 8, 2012. [*Id.* at 26].

At Step 5, the ALJ determined that prior to April 8, 2012, Ms. Hines' exertional and non-exertional limitations would not preclude employment as a silverware wrapper, a retail marker, or as a housekeeper/housecleaner. [#10-2 at 27-28]. The ALJ's findings that these occupations exist in substantial numbers in the national economy appear to have been premised on estimates provided in the United States Department of Labor's *Dictionary of Occupational Titles*. [*Id.*].

Plaintiff contends that the ALJ's onset determination is not supported by substantial evidence, and that the ALJ erred in relying on the *Dictionary of Occupational Titles* in finding

that substantial numbers of positions in the national economy are available as silverware wrappers or retail markers. [#16 at 27-30].

## III. Relevant Medical History

### A. Plaintiff's Carpal Tunnel Syndrome

The following facts are gleaned from Plaintiff's medical records as found in the Administrative Record. On March 11, 2010, Ms. Hines visited the emergency room complaining of numbness and pain in her right wrist. [#10-10 at 143]. A clinical impression of carpal tunnel syndrome is indicated in the medical records of this visit. [*Id.* at 144]. The records also indicate that a Velcro wrist splint and pain medication were prescribed, and that a referral to a hand surgeon was provided. [*Id.*].

On March 17, 2010, Ms. Hines visited her family care practitioner complaining of numbness in a number of fingers in her right hand. [#10-9 at 97]. A primary diagnosis of cubital tunnel syndrome is indicated in the treatment records of this visit. [*Id.* at 98]. The treating physician recommended initially attempting "conservative[]" treatment with Motrin and physical therapy. [*Id.* at 97].

On March 25, 2010, Ms. Hines visited the emergency room. [#10-10 at 84]. The treatment notes reflect that Ms. Hines complained of back pain and right arm numbness. [*Id.*]. Specifically, Ms. Hines stated that she on occasion suffered numbness in her 4th and 5th fingers, and that pain would radiate from her wrist to her shoulders. [*Id.*]. A Phalen test for carpal tunnel syndrome was performed, and the results indicated the presence of the syndrome. [*Id.* at 85]. The treating physician prescribed a Velcro wrist splint and Percocet for pain management. [*Id.* at 86]. The treatment notes also indicate that Ms. Hines was advised to pursue physical therapy and to consult a hand surgeon. [*Id.*].

Ms. Hines' treatment records indicate that on March 30, 2010, Ms. Hines began a course of physical therapy to address conditions including pain and loss of strength in her right wrist and hand. [#10-7 at 37]. On November 11, 2010, the physical therapy treatment records indicate that Ms. Hines reported increased pain when using her right arm. [#10-8 at 3]. On December 10, 2010, physical therapy was apparently discontinued at a time when treatment goals had not yet been reached, with pain management listed as an alternate course of treatment. [#10-7 at 37].

On April 28, 2011, Ms. Hines underwent a consultative examination performed by Dr. Dowin H. Boatright. [#10-9 at 110-13]. Although there is no indication in Dr. Boatright's consultative examination report that Ms. Hines' upper extremities were evaluated for any functional limitations potentially associated with carpal tunnel syndrome (or that Ms. Hines complained of any such limitations during her examination), the report does state that no "manipulative limitations" were observed. [*Id.* at 113].

In November of 2011, a functional limitations assessment report was prepared for the Colorado Department of Human Services by Melissa Haberzett, M.P.T. [#10-14 at 52-53]. The report noted Ms. Haberzett's opinion that Ms. Hines could only occasionally grasp with her right or left hand, and only occasionally perform fine finger manipulations. [*Id.* at 53]. Ms. Haberzett opined that Ms. Hines "should avoid repetitive and frequent (7 1/3 of day) use" of her upper extremities. [*Id.* at 52].

Throughout 2011, Ms. Hines visited the emergency room on a number of occasions, and also sought treatment from other medical providers, for medical conditions including back pain, ovarian cysts, palpitations, and nausea. On a number of occasions, Ms. Hines apparently did not note any complaints with respect to carpal tunnel syndrome. [#10-9 at 20-22, #10-10 at 13, *id.* at 18, *id.* at 30-31, *id.* at 40, *id.* at 52, *id.* at 98, *id.* at 109, and *id.* at 115]. On a number of other

occasions between October and December of 2011, Ms. Hines visited the emergency room complaining of pain and numbness in her upper extremities. [#10-14 at 11, *id.* at 15, *id.* at 32].

On January 6, 2012, in the course of receiving an occupational therapy initial evaluation for thoracic outlet syndrome/brachia plexus, Ms. Hines apparently reported to her physical therapist that she had been experiencing numbness bilaterally in her upper extremities, and that she had woken up in October of 2011 with numbness in her left upper extremity. [#10-13 at 126].

In March of 2012, Ms. Hines visited a physician and noted two years of complaints with respect to bilateral hand numbness. [#10-14 at 54]. Nerve conduction testing indicated severe bilateral carpal tunnel syndrome. [*Id.*]. The physician indicated that he believed Ms. Hines should consider carpal tunnel release surgery. [*Id.*].

At the time of the hearing, Plaintiff had undergone carpal tunnel release surgery on her left wrist, and was waiting on clinical assessment of the efficacy of the surgery to her left wrist before proceeding forward with surgery on her right wrist. [#10-2 at 55].

### B.   Plaintiff's History of Mental Health Impairments

*2010.* On January 14, 2010, Ms. Hines visited the emergency room, complaining of dizziness and anxiety. [#10-10 at 2-3]. Ms. Hines was diagnosed with positional vertigo, with an anxiety component. [*Id.*]. On January 16, 2010, Ms. Hines admitted herself to Cedar Springs Behavioral Health System due to depression and suicidal thoughts. [#10-7 at 2]. Against the advice of her treaters at the Cedar Springs facility, she elected to leave two days later on January 18, 2010 to attend to domestic difficulties between her significant other and her mother. [*Id.* at 2-3]. Ms. Hines was diagnosed with Axis I bipolar and anxiety disorders. [*Id.* at 3]. Ms. Hines'

GAF[3] score at the time of her admission was 30, and rose to 45 at the time of her discharge. [*Id.*]. At the time of discharge, Ms. Hines was no longer believed to be a threat to herself or others, and her judgment and insight were noted to have improved. [*Id.* at 2-3]. Between August and November of 2010, Ms. Hines visited a family medical provider on several occasions, complaining of problems including anxiety. [#10-9 at 38-41, *id.* at 59-63]. On October 25, 2010, Ms. Hines sought treatment from Memorial Health System Urgent Care for conditions including anxiety. [#10-11 at 9].

*2011.* Five months later, on March 31, 2011, Ms. Hines sought psychiatric care from a new provider. [#10-11 at 71-72]. The treatment notes indicate that Ms. Hines reported that Celexa and Xanax helped control her symptoms of anxiety. [*Id.*]. Ms. Hines also reported symptoms of mania, and stated that she thought she had heard a voice, although she believed it to be her own. [*Id.*]. Ms. Hines was diagnosed with major depressive and panic disorders. [*Id.*]. On April 26, 2011, psychologist Brett Valette examined Plaintiff. [#10-8 at 56-58]. Mr. Valette's subsequent report suggested that at the time of evaluation, Plaintiff suffered only mild to moderate limitations due to her mental and physical impairments in daily and social living. [*Id.* at 57-58]. Mr. Valette diagnosed Ms. Hines with major depression, generalized anxiety disorder, and mild post-traumatic stress disorder. [*Id.* at 58]. Ms. Hines denied psychotic or

---

[3] "GAF" stands for Global Assessment of Functioning, which is a scale that assigns a score to reflect an individual's psychological, social, and occupational functioning. The scale is from 0 to 100, with a higher score indicating a higher level of functioning. A GAF score of 30 indicates serious impairment in communication or judgment or an inability to function in almost all areas. Am. Psychiatric Ass'n *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) at 34 (4th ed. Text Revision 2000). A GAF score of 45 indicates serious symptoms or serious impairment in social, occupational, or school functioning. *Id.* The current Diagnostic and Statistical Manual of Mental Disorders (DSM-V) does not use GAF. Am. Psychiatric Ass'n *Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) at 16 (5th ed. 2013).

manic symptoms. [*Id.* at 57-58]. Mr. Valette noted that although Ms. Hines appeared to have some mild issues with post-traumatic stress disorder and her other mental health impairments, the major limiting issue for Ms. Hines seemed to be physical pain. [*Id.* at 58]. Mr. Valette determined that Ms. Hines' GAF score at the time of assessment was between 60 and 65. [*Id.*].

*2012.* In April of 2012, Ms. Hines was admitted to a psychiatric care facility shortly after an attempted overdose. [#10-11 at 45]. An April 10, 2012 clinical evaluation noted that Ms. Hines attributed the suicide attempt to "stress and hopelessness." [*Id.*]. Ms. Hines noted recent difficulties with finances and family life, including an eviction from her father's house. [*Id.*]. The physician evaluating Ms. Hines determined that Ms. Hines' GAF score at the time of evaluation was 38. [*Id.*].

## ANALYSIS

### I.   ALJ's Determination that Ms. Hines' Carpal Tunnel Syndrome Was Non-Severe

In finding that Plaintiff's carpal tunnel syndrome was not severe at Step 2, the ALJ relied on evidence that although carpal tunnel syndrome had been clinically indicated in March of 2010, the initial prescribed course of treatment in the spring of 2010 consisted only of a wrist splint and pain medication. [#10-2 at 21-22]. The ALJ also relied on evidence in Plaintiff's medical records that during a number of Plaintiff's subsequent visits to the emergency room, Plaintiff did not consistently complain of symptoms consistent with carpal tunnel syndrome. [*Id.*]. Finally and principally, the ALJ asserted that there was an absence of evidence that Plaintiff had sought further treatment again until March of 2012, when carpal tunnel release surgery was indicated. [*Id.*].

In her Opening Brief, Plaintiff contends that the ALJ erred in failing to consider evidence that Plaintiff had, in fact, undergone physical therapy to treat her carpal syndrome from March to

11

December of 2010, and once again sought treatment in January of 2012.  [#16 at 22-23]. Plaintiff also argues that the ALJ failed to consider evidence that Plaintiff, during a number of her emergency room visits in 2011, reported tingling and numbness in her upper extremities. [*Id.*].

In response, the Commissioner argues that Ms. Hines' "sparse and inconsistent treatment record" by itself constitutes substantial evidence required affirmance.  [#19 at 8].  This court respectfully disagrees, as the ALJ's decision does not attempt to account for potential alternative explanations for the lack of treatment.  *See Hamilton v. Colvin*, 8 F.Supp.3d 232, 240 (N.D.N.Y. 2013) (reversing and remanding for reconsideration of finding that carpal tunnel syndrome was not severe based on a two year treatment gap because to "the extent the ALJ used the lack of treatment as a basis for discounting Plaintiff's testimony concerning the extent of his impairment, the ALJ was obliged to consider whether the lack of treatment during that time period had another cause").  As the Tenth Circuit has recognized in the context of failures to pursue a prescribed course of treatment, the finder of fact must consider the following elements:  "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse."  *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987).  Because the specific evidence relied upon in the Record in the ALJ's decision—which amounts to little more than the purportedly conservative course of treatment initially prescribed, and an apparent treatment gap between the months of December 2010 and January of 2012—is not "substantial" standing alone, the court finds that remand is necessary.

Just as importantly, "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as

significant probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). In the view of the court, evidence in the Record that *e.g.* Plaintiff's wrist strength remained limited after months of physical therapy in 2010 constitutes significant contrary evidence that the ALJ is obliged to discuss in determining whether Ms. Hines' carpal tunnel syndrome is a sever impairment at Step 2. On remand, in determining whether Ms. Hines' carpal tunnel syndrome was a severe impairment during the relevant time period, the ALJ is directed to discuss any contrary "uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significant probative evidence [the ALJ] rejects." *Clifton*, 79 F.3d 1007, 1010.

Moreover, regardless of severity of Ms. Hines' carpal tunnel syndrome assessed at Step 2, the ALJ is directed to expressly account for this impairment in the determination of Ms. Hines' residual functional capacity at Step 4 upon remand. *See Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (recognizing that in the residual functional capacity assessment, "the ALJ must consider the combined effect of all medically determinable impairments, whether severe or not") (citing 20 C.F.R. §§ 404.1545(a)(2)).

## II.   ALJ's Determination of the Onset Date of Ms. Hines' Mental Health Impairments

Plaintiff contends that there is overwhelming evidence in the Record that her mental health impairments supported a finding of disability at Step Four from her revised claimed onset date of December 3, 2009, and therefore, the ALJ's conclusion to the contrary is not supported by substantial evidence. [#16 at 24-26]. But as reflected in the 2010 and 2011 treatment records expressly relied on by the ALJ, Plaintiff's mental health impairments appeared to improve subsequent to her voluntary hospitalization in January of 2010. [#10-2 at 25]; *see also* [#10-11 at 71-72] (treatment records reflecting symptom relief from appropriate medication). The fact that Ms. Hines continued to complain of her mental health impairments, and continued to seek

treatment for them, does not by itself constitute overwhelming evidence that Ms. Hines' mental health impairments precluded any substantial gainful employment prior to April of 2012 for any extended period of time.  Indeed, in the absence of contrary medical findings, the court can discern no error in the ALJ's determination that the results summarized in Mr. Valette's report on his April 26, 2011 evaluation of Ms. Hines provide substantial evidence that Ms. Hines' mental health impairments were not so disabling as to persistently preclude any gainful employment prior to the spring of 2011.  [#10-8 at 56-58].  In brief, Mr. Valette found that at the time of evaluation, Ms. Hines' cognitive functions remained intact, and that Ms. Hines was able to capably manage her own funds and tend to other tasks of daily and social living.  [*Id.*].

However, this court cannot find that the ALJ supported her finding of an onset date no earlier than April 8, 2012, with substantial evidence.  The Commissioner contends that the Record taken as a whole indicates that Ms. Hines was in acute distress due to her eviction in March or April of 2012, and does not reflect an earlier period of decompensation.  [#19 at 9]. But that reasoning—along with citation to substantial supporting evidence—is absent from the ALJ's decision.  Because the ALJ's decision must be evaluated "based solely on the reasons given stated in the decision," *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004), the court finds that remand as to the onset date of Ms. Hines' disability is necessary.

## CONCLUSION

IT IS ORDERED that the decision of the Commissioner is REVERSED, and the matter is REMANDED for further proceedings to clarify the ALJ's findings as to whether Ms. Hines' carpal tunnel syndrome constitutes a "severe" impairment at Step 2 and what limitations it might pose as to her residual functional capacity at Step 4.  The ALJ is also directed to clarify the

ALJ's findings as to the onset date of Ms. Hines' disability.  Because those determinations could alter the ALJ's analysis at Step 5, the court declines to address Plaintiff's remaining arguments.[4]

DATED September 24, 2015				BY THE COURT:

						s/ Nina Y. Wang
						Nina Y. Wang
						United States Magistrate Judge

---

[4] Although in the view of the court neither Party adequately briefed the issue, the court notes that there is authority outside the Tenth Circuit holding that *the Dictionary of Occupational Titles* by itself does "does not contain [sufficient] information on which to base an estimate of the number of available jobs of a particular kind." *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015) (collecting authorities).